UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Tamara Latoya Brown,

      Plaintiff,

      v.                                    Civil Action No. 5:13-cv-153

Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION
(Docs. 7, 11)

Plaintiff Tamara Latoya Brown brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits. Pending before the Court are Brown's motion to reverse the Commissioner's decision (Doc. 7), and the Commissioner's motion to affirm the same (Doc. 11).

For the reasons stated below, I recommend that Brown's motion be GRANTED, in part, the Commissioner's motion be DENIED, and the matter be REMANDED for further proceedings and a new decision.

## Background

Brown was 30 years old on her alleged disability onset date of August 15, 2009. She obtained her high school diploma in 2000 through an adult degree program. She

started working in 1995, and has held jobs as a cashier, a customer service representative, a warehouse clerk, a deli clerk, and a housecleaner.  Most recently, she worked part time as a cashier at Dunkin Donuts for approximately one year until she quit due to back pain.

During the alleged disability period, Brown lived with her fiancé and her two children, who were approximately five and seven years old.  The older of these children has a seizure disorder and behavioral problems, requiring regular medical care and other professional assistance.  Brown also has two teenage children who live with her mother. For approximately a five-year period prior to or during the alleged disability period, Brown stayed at home and cared for her children with the help of her fiancé, a friend, and various providers employed by state agencies.

Brown has had chronic low back pain with mild scoliosis since about 16 years of age, causing pain when standing or walking for extended periods and when lifting heavy objects.  In 2009, Brown underwent MRIs of the lumbar spine, which revealed left paracentral disc protrusion at L5-S1.  (AR 540, 584.)  She also suffers from leg and knee pain, and in November 2008, she had surgery on her knee.  (AR 518.)  In addition to her back, leg, and knee problems, Brown also has migraine headaches, depression, posttraumatic stress disorder ("PTSD"), and a learning disability.  A December 2009 evaluation from the Stern Center for Language and Learning states that Brown has a language-based learning disability which negatively impacts her reading fluency and comprehension for difficult text as well as her ability to write.  (AR 503.)  Although the evaluation found that Brown was determined and persistent, it stated that she required "appropriate intervention" in order to succeed professionally, and noted that she

2

experienced symptoms associated with depression and anxiety.  (*Id.*)  Brown has had

multiple suicide attempts, and was a victim of domestic violence.  She also suffers from

spine arthritis, hypoglycemia, and asthma.

In February 2010, Brown filed applications for social security income and

disability insurance benefits alleging disability as of August 15, 2009.[1]  In her disability

application, she alleged that she stopped working on July 20, 2009 because of her chronic

lower back pain, arthritis, depression, anxiety, asthma, PTSD, learning disability, and

migraine headaches.  (AR 163.)  In an updated report, Brown stated that she rarely left

her house because of depression; her back pain limited her ability to walk, do housework,

and sleep; and she depended on her fiancé to do most of the housework and childcare

responsibilities.  (AR 251, 255.)  She further stated that she sometimes has suicidal

thoughts and does not do any social activities or have any hobbies because of pain,

depression, anxiety, and PTSD.  (AR 255.)

Brown's application was denied initially and upon reconsideration, and she timely

requested an administrative hearing.  The hearing was conducted on February 16, 2012

by Administrative Law Judge ("ALJ") Paul Martin.  (AR 37–58.)  Brown appeared and

testified, and was represented by an attorney.  A vocational expert ("VE") also testified at

the hearing.  On March 31, 2012, the ALJ issued a decision finding that Brown was not

disabled under the Social Security Act from her alleged onset date through the date of the

decision.  (AR 12–25.)  Thereafter, the Appeals Council denied Brown's request for

---

[1]  Initially, Brown alleged disability as of December 31, 2003, but she amended that date to
August 15, 2009 at the administrative hearing.  (AR 41.)

review of the ALJ's decision, rendering it the final decision of the Commissioner.  (AR 1–4.)  Having exhausted her administrative remedies, Brown filed the Complaint in this case on June 5, 2013.  (Doc. 4.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if the impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity ("RFC"), meaning "the most [the claimant] can still do despite [his or her mental and physical] limitations," based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545, 416.920(e), 416.945.  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the

claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant

bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at

383; and at step five, there is a "limited burden shift to the Commissioner" to "show that

there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566

F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step

five is limited, and the Commissioner "need not provide additional evidence of the

claimant's [RFC]").

Employing this sequential analysis, ALJ Martin first determined that, although

Brown had worked after the alleged disability onset date of August 15, 2009, she had not

engaged in substantial gainful activity during that period.  (AR 15.)  At step two, the ALJ

found that Brown had the severe impairments of lower back pain with sciatica, migraine

headaches, major depressive disorder, PTSD, and a learning disability.  (*Id.*)  The ALJ

found that Brown's asthma, carpal tunnel syndrome, and gastroesophageal reflux disease

were non-severe.  (*Id.*)  At step three, the ALJ found that none of Brown's impairments,

alone or in combination, met or medically equaled a listed impairment.  (AR 15–17.)

Next, the ALJ determined that Brown had the RFC to perform "light work," as

defined in 20 C.F.R. § 404.1567(b), with the following conditions:

> [Brown has] the ability to lift and carry [20] pounds occasionally and [10]
> pounds frequently[,] with the ability to stand and walk for six hours in an
> eight-hour workday and sit for six hours in an eight-hour workday.
> Additionally, [Brown] can frequently climb ramps and stairs as well as
> balance.  She retains the ability to occasionally climb ladders, ropes[,] and
> scaffolds, stoop, kneel, crouch[,] and crawl.  [She] has the ability to
> understand, remember[,] and carry[ ]out one[-]to[-]three[-]step tasks.  She
> can sustain concentration, persistence[,] and pace for over two-hour periods
> over a typical workday and workweek.  She can manage brief social

interactions with supervisors.  She can adapt to occasional and routine changes.  She can avoid hazards, travel[,] and make basic decisions.

(AR 17.)  Given this RFC, and considering the VE's testimony, the ALJ found that Brown is capable of performing her past relevant work as a housekeeper and dining attendant.  (AR 23.)  Alternatively, and again based on testimony from the VE, the ALJ determined that there are other jobs existing in significant numbers in the national economy that Brown can do.  (AR 23–24.)  The ALJ concluded that Brown had not been disabled from the alleged onset date of August 15, 2009 through the date of the decision.  (AR 24.)

## **<u>Standard of Review</u>**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct

legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the fact finder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should consider that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Brown argues that the ALJ erred in his analysis of the medical opinions, particularly those of treating/examining providers Dr. Karen Huyck, Dr. David Park, licensed clinical social worker Joyce Perkins, and vocational counselor Linda Glasgo. Brown further contends that the ALJ's credibility determination is not supported by substantial evidence.  Brown claims that these errors resulted in an improper RFC assessment and an improper decision regarding Brown's ability to do her past work.  The Commissioner disagrees, contending that the ALJ properly relied on the opinions of agency consultants Drs. Leslie Abramson, Patricia Pisanelli, L. Lester, and Ellen Atkins

in formulating Brown's RFC.  Moreover, the Commissioner argues that the ALJ's adverse credibility determination is supported by substantial evidence.

## I.     ALJ's Analysis of the Medical Opinions

### A.     Relevant Law

The treating physician rule states that a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record."  20 C.F.R. § 404.1527(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993).  Even when a treating physician's opinion is not given controlling weight, the opinion is still entitled to some weight because a treating physician is "likely to be the medical professional[] most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence . . . ."  20 C.F.R. § 404.1527(c)(2).  When the ALJ decides to afford less than controlling weight to a treating physician's opinion, the ALJ must consider the regulatory factors in determining how much weight is appropriate.  *Richardson v. Barnhart*, 443 F. Supp. 2d 411, 417 (W.D.N.Y. 2006) (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)).  These factors include: the length of the treatment relationship, the frequency of examination, the supportability of the opinion, whether the opinion is consistent with the record as a whole, and whether the opinion is given by a specialist about medical issues related to his or her area of specialty.  20 C.F.R. § 404.1527(c).  After considering these factors, the ALJ must "give good reasons" for the weight afforded to the treating source's opinion.

*Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (quotation marks and citation omitted).  The Second Circuit has consistently held that the failure to provide good reasons for not crediting the opinion of a treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

### B. Examining Consultant Dr. Huyck

In February 2012, Dr. Karen Huyck, a doctor specializing in occupational medicine, examined Brown in consultation with Brown's primary care physician, Dr. David Park, to assess Brown's work capacity.  (AR 799–806.)  Based on her examination of Brown, as well as her review of Brown's medical records, Dr. Huyck concluded that Brown had significant functional restrictions in her ability to sit, stand, and lift objects, consistent with a sedentary work capacity.  (AR 805–06.)  Dr. Huyck further opined that Brown's "marked mental health disorders, severe and frequent headaches, fine motor deficits, and learning disabilities need to be taken into account to assess her ability to maintain substantial gainful employment."  (AR 806.)  The ALJ assigned "little weight" to these opinions on the grounds that they are on an issue reserved to the Commissioner and inconsistent with the record as a whole, including evidence that Brown attended college-level courses.  (AR 21.)

The Commissioner correctly notes that Dr. Huyck is not considered a "treating physician" under the regulations because she met with Brown on only two occasions.[2]

---

[2] The ALJ's statement in his decision that Dr. Huyck was Brown's "treating physician" is incorrect.  (AR 21.)

*Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (treating sources who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians); *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988) (defining a "treating physician" as a physician "who has or had an ongoing treatment and physician-patient relationship with the individual"). Therefore, the treating physician rule does not apply to Dr. Huyck's opinions. But the regulations still required the ALJ to consider the regulatory factors in deciding what weight to give these opinions. *See* 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight . . ., we consider all of the [regulatory] factors in deciding the weight we give to any medical opinion."); *see also* 20 C.F.R. § 404.1527(e)(2)(ii). The ALJ did not consider several key factors that favored giving more weight to Dr. Huyck's opinions. First, Dr. Huyck specializes in occupational medicine, the subject of her opinions. Second, Dr. Huyck examined Brown, meeting with her on two occasions. The regulations provide that, in general, "more weight" is given to the opinion of a medical source who has examined the claimant than to the opinion of a source who has not. 20 CFR § 404.1527(c)(1); *see Havas v. Bowen*, 804 F.2d 783, 786 (2d Cir. 1986) ("opinions of nonexamining medical personnel cannot in themselves constitute substantial evidence overriding the opinions of examining physicians"). Third, Huyck's opinions are supported by her own objective findings (AR 795–806), as well as by the objective findings and opinions of Brown's treating providers, as discussed below.

Despite the ALJ's finding to the contrary, Dr. Huyck's opinions are consistent with substantial evidence in the record.  (*See, e.g.*, AR 288 (note from former employer stating that Brown quit job "due to issues she was having with her knees"); AR 455–66 (medical progress notes documenting back, hip, and leg pain); AR 611 (physical therapy notes documenting pain, antalgic gait, restricted range of motion, and lack of strength); AR 613 (physician's assistant note stating physical examination findings revealed spine tenderness, decreased range of motion, positive straight-leg raise; and imaging showed degenerative changes in joints, a central disc protrusion, and facet arthropathy at multiple levels); AR 668–74 (physical therapy notes documenting pain, antalgic gait, and limited range of motion).)  In particular, Dr. Huyck's opinions are consistent with an October 2009 functional capacity assessment prepared by physical therapist Birgit Ruppert.  (AR 598–600.)  After evaluating and observing Brown, Ruppert opined—like Dr. Huyck— that Brown was capable of only sedentary physical work.[3]  (AR 599.)  Ruppert explained: "Brown has functional limitations in gait, [active range of motion] of the lumbar spine, cardiovascular endurance, functional strength, and overall physical capacities that interfere with her ability to perform basic functional tasks and [activities of daily living] that affect her quality of life."  (*Id.*; *see also* AR 610.)  Dr. Huyck's opinions are also

---

[3] The ALJ incorrectly referred to Ms. Birgit Ruppert as "Ruppert Birgit" and "Mr. Burgit."  (AR 20.)  Although the ALJ gave "[g]reat weight" to Ruppert's "objective findings," he gave only "limited weight" to Ruppert's opinion that Brown could do no more than sedentary work.  (AR 20–21.)  The ALJ justified these seemingly inconsistent findings by stating that Ruppert's opinions are based on Brown's self-reporting and not on objective medical findings.  (AR 21.)  The evidence does not support this explanation (*see* AR 598–600, 608–10), and thus the ALJ should reconsider Ruppert's opinions on remand.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability.").

11

supported by her own objective findings of chronic low back pain and objective deficits in fine motor coordination and ambulation.  (AR 794–98.)  Also significant, Brown's treating physician, Dr. Park, who had an extensive and ongoing treating relationship with Brown, agreed with Dr. Huyck's opinions regarding Brown's physical limitations, as discussed in more detail below.  (*See* AR 33–36.)

The ALJ correctly noted that he could not adopt Dr. Huyck's opinion that Brown was unable to work, given that the ultimate issue of disability is reserved to the Commissioner.  *See Snell v. Apfel*, 177 F.3d 128, 133–34 (2d Cir. 1999) ("The final question of disability is . . . expressly reserved to the Commissioner."); 20 C.F.R. § 404.1527(d).  It does not follow, however, that the ALJ was therefore relieved of his obligation to carefully consider and provide good reasons for rejecting Dr. Huyck's opinions as a whole.  The Social Security Administration explained as follows:

> The regulations provide that the final responsibility for deciding issues such as [whether an individual is "disabled" under the Social Security Act] is reserved to the Commissioner.
>
> Nevertheless, our rules provide that *adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner.* . . .
>
> . . . If the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record.
>
> *In evaluating the opinions of medical sources on issues reserved to the Commissioner, the adjudicator must apply the applicable [regulatory] factors . . . .*

SSR 96-5p, 1996 WL 374183, at *2-3 (1996) (emphases added).  Here, the ALJ considered the opinions of Dr. Huyck but did not properly apply the applicable regulatory factors in determining what weight to afford to them.

### C.    Treating Physician Dr. Park

The ALJ also erred in failing to mention the opinions of treating primary care physician Dr. Park, who treated Brown's chronic depression and other ailments from approximately 2010 to 2012.[4]  Less than one month after the February 2012 administrative hearing, Dr. Park submitted an RFC assessment wherein he deferred to Dr. Huyck's assessment of Brown's physical RFC (discussed above) (AR 33–35), and stated that he "believe[s] that [Brown's] psychiatric limitations/diagnoses keep her from engaging in meaningful, gainful employment [and] disable her to a significant degree" (AR 36).  The ALJ appears not to have considered these opinions, even though (a) Dr. Park's assessment was submitted over two weeks before the date of the ALJ's decision (*compare* AR 25 *and* AR 32); and (b) the ALJ stated in his decision that he admitted into the record additional evidence submitted after the hearing (AR 12).  This was clear error.

Because Dr. Park was Brown's treating physician, the ALJ was required to use the treating physician rule in analyzing his opinions and give good reasons if he decided not to credit those opinions.  *See Schaal*, 134 F.3d at 505; *Halloran*, 362 F.3d at 33.  As explained above, although Dr. Park's opinion that Brown was unable to work is on an issue reserved to the Commissioner, the ALJ was not relieved of his obligation to

---

[4]  The record reflects that, prior to 2010, Brown saw other medical providers in Dr. Park's office, including Elizabeth Romano, RN and Joanne Hayes, FNP.  (*See, e.g.*, AR 508–18.)

carefully consider and provide good reasons for rejecting Dr. Park's opinions as a whole. The ALJ's failure to consider Dr. Park's opinions was not harmless because, even assuming those opinions are not entitled to "controlling weight," several of the regulatory factors favor affording significant weight to them.

First, Dr. Park had an ongoing treatment relationship with Brown, seeing her frequently and treating her depression, back pain, and headaches; and referring her to specialists for various mental and physical problems. Second, Dr. Park's treatment notes support his opinion that Brown was significantly limited by her mental and physical impairments. (*See, e.g.*, AR 752 ("having more suicidal thoughts lately, has a general plan," "[d]iscussed keeping close touch with her therapist"); AR 756 (follow-up appointment after brief stay at Brattleboro Retreat for fourth suicide attempt); AR 758 ("[b]ack pain remains chronically—continues to see spine center and get PT treatment"); AR 768 ("continuing to see counseling on a weekly basis," "has resumed cutting herself," "healed cutting scars on ventral [left] forearm," "need[s] psychiatric care"); AR 772 ("counselor was concerned enough . . . to increase the frequency of her visits to [twice]/week"); AR 775 ("has not yet started up her depression medications since she stopped them when she had epigastric pain that brought her to the . . . ER late last month," "[d]iscussed importance of restarting her medications again, especially in light of the need for her to interact with her daughter in a more constructive way").) Third, Dr. Park's opinions are consistent with the opinions of several other examining or treating

providers, including those of Dr. Huyck[5], physical therapist Ruppert[6], social worker Perkins (discussed below), and vocational counselor Glasgo (discussed below). Furthermore, it is likely that Dr. Park's opinions, if considered by the ALJ, would have affected the ALJ's step-five finding that Brown's nonexertional limitations, including her depression and chronic pain, had "little or no effect" on her ability to work.  (AR 24.)

### D.    Social Worker Perkins and Vocational Counselor Glasgo

In February 2003, Brown began treating with Joyce Perkins, L.C.S.W., a licensed clinical social worker, "to receive trauma[-]specific therapy to address the trauma in her life which was a barrier to employment[] and daily functioning."  (AR 684.)  Over eight years later, in September 2011, Perkins completed a mental RFC assessment, wherein she opined that Brown had marked restrictions in several significant work-related functional areas, including her ability to make judgments and understand complex instructions.  (AR 762.)  Perkins also opined that Brown had moderate restrictions in her ability to interact with supervisors and coworkers, and respond appropriately to usual work situations.[7] (AR 763.)  The ALJ found that the evidence supported Perkins's finding that Brown was

---

[5]  *See* AR 805 ("likely meets criteria for affective disorder and that would need to be confirmed with her primary care physician.  She does have suicidal thoughts, anhedonia [(inability to experience pleasure from activities usually found enjoyable)], appetite disturbance, sleep disturbance, psychomotor retardation, and feelings of worthlessness that interfere with her ability to function socially and vocationally.").

[6]  *See* AR 599 ("Brown has physical limitations in gait, [active range of motion] of the lumbar spine, cardiovascular endurance, functional strength, and overall physical capacities that interfere with her ability to perform basic functional tasks and [activities of daily living] that affect her quality of life.").

[7]  Additionally, in an undated report, Perkins summarized her treatment of Brown and opined that, given Brown's PTSD, physical disabilities, and learning disability, she was unable to maintain any type of employment.  (AR 686.)  Perkins stated: "[Brown] is on a path of getting some parts of her life together.  Unfortunately[,] she had been able to do this before in small increments, but unable to maintain those skills without the tremendous supports of those around her."  (*Id.*)

limited to simple, one-to-three-step tasks, but gave only "some weight" to Perkins's

opinions as a whole because they "overstated" the severity of Brown's limitations.  (AR

22.)

In February 2012, Linda Glasgo, M.Ed., a vocational counselor for the State of

Vermont's Division of Vocational Rehabilitation, submitted a letter in support of

Brown's disability claim.  (AR 320.)  Therein, Glasgo stated that Brown received

vocational rehabilitation services starting in 2008, but her file was closed in July 2009

when she became successfully employed and then reopened in November 2009 when she

was unable to do her job due to physical issues.  (*Id.*)  Glasgo stated that Brown stood out

as someone who wanted to work and wanted a career but struggled with physical and

mental health issues and was "doing the best she [could] to make small steps towards an

employment goal."  (*Id.*)  Given Brown's "seemingly deteriorating health" and

significant mental health issues, Glasgo supported Brown's efforts to obtain social

security benefits "as a component of her successful journey towards competitive

employment at some point in time."  (*Id.*)  The ALJ "considered" Glasgo's opinions, but

found that the record as a whole, including Brown's ability to maintain her household and

attend college-level courses, was inconsistent with a finding of total disability.  (AR 23.)

As a licensed clinical social worker and a vocational counselor working for the

State of Vermont, Perkins and Glasgo were not "acceptable medical sources"; thus, their

opinions are not entitled to the same weight as those of a treating physician.  20 C.F.R. §§

404.1513(a), 416.913(a); *see Marziliano v. Sullivan*, 771 F. Supp. 69, 75 (S.D.N.Y. 1991)

(opinion of social worker did not command same weight as that of treating physician).

Nonetheless, the ALJ was required to provide a reasonable explanation, considering the regulatory factors, for his decision to afford limited weight to their opinions. *See, e.g.*, *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) (citing SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006)).  Social Security Ruling ("SSR") 06-03p states that, in addition to evidence from "acceptable medical sources," ALJs may use evidence from "other sources" to show the severity of the claimant's impairments and how they affect the claimant's ability to function. *Id.*  These "other sources" include medical sources who are not "acceptable medical sources," such as licensed clinical social workers, and "[n]on-medical sources," such as public and private social welfare agency personnel. *Id.*

SSR 06-03p explains that medical sources like licensed clinical social workers, who are not technically deemed "acceptable medical sources" under the regulations, "have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." *Id.* at *3. Thus, opinions from these medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.*  The SSR further explains that "non-medical sources," such as social welfare agency personnel who are not health care providers and have had contact with the claimant in their professional capacity, are also valuable sources of evidence for assessing impairment severity and functioning. *Id.*  "Often, these sources have close contact with the [claimant] and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of

17

time." *Id.* SSR 06-03p directs ALJs to apply the same factors for the evaluation of "other sources," including social workers and vocational counselors, as are used to evaluate the opinions of "acceptable medical sources," including treating and examining physicians. *Id.* at *4.

Here, the ALJ did not apply the regulatory factors, and gave no explanation for his findings that Perkins's opinions overstated Brown's limitations and Glasgo's opinions were inconsistent with the record. (AR 22, 23.) Applying the factors, the ALJ should have given more weight to these opinions. Regarding Perkins's opinions: (1) Perkins had a long treatment relationship with Brown, seeing her frequently from 2003 to 2004 and then again from 2007 through the February 2012 administrative hearing (*see* AR 684–88, 762–67, 792); (2) Perkins is a clinical therapist, specializing in trauma-specific treatment of individuals like Brown; and (3) Perkins's opinions are supported by and consistent with the treatment notes and opinions of other treating and consulting providers, including Dr. Huyck, Dr. Park, consulting clinical psychologist Dr. Stanley Augenstein (*see* AR 337) (interaction with others "seems to be poor," prognosis "guarded," "continues to be quite depressed and easily moved to crying"), and the Brattleboro Retreat physicians who treated Brown when she was involuntarily admitted in April 2011 for a suicide attempt (*see, e.g.*, AR 709 ("[a]ppears to be chronically and fairly severely depressed," "intermittently suicidal," "one suspects that her depression is never in full remission").

The same factors apply regarding Glasgo's opinions: (1) Glasgo saw Brown in a professional capacity for over four years, referred Brown for psycho-educational testing

at the Stern Center for Language and Learning, and analyzed the results of such testing thereafter (*see* AR 320, 503); (2) Glasgo has her master's degree in vocational counseling and works for the Vermont Division of Vocational Rehabilitation, specializing in the area under review; and (3) Glasgo's opinions are supported by and consistent with the treatment notes and opinions of other providers, including Perkins, Dr. Park, and Dr. Huyck.  The ALJ's finding that Glasgo's opinions are inconsistent with the record as a whole, given Brown's ability to "maintain her household and attend college[-]level courses" (AR 23), is not supported by substantial evidence.  Regarding Brown's ability to maintain her household, the record reveals that she was unable to care for her home and her children on her own, requiring help from her fiancé, a friend, and state agencies.  (AR 44, 46–47, 230–32, 251, 255, 258–60, 684–88, 765–67, 803.)  Dr. Huyck wrote in a progress note: "Her friend comes over every day to help her with her daughter because of her anxiety and depression. . . .  She takes breaks when doing housework.  Her friend or her fiancé[] remind her to take her medications."  (AR 803.)  Perkins recorded that Brown "had a full team of professionals around her in 2008 that helped her maintain her daily life," including establishing housing, enrolling her in programs to develop work skills, establishing systems to maintain medical appointments and other activities, and helping her care for her young children; but she still became overwhelmed and was "severely incapacitated" at times, particularly when her children started showing signs of anxiety and dysregulation.  (AR 685.)  Brown herself stated in a Function Report that she requires reminders from her fiancé to perform such essential personal care activities as bathing, brushing her teeth, and taking her medication.  (AR 231.)

With respect to Brown's ability to attend college-level courses, the record reveals that Brown's participation in these courses—which required about five hours each week, as opposed to the 40 hours that would be required to do a full-time job—was not a small undertaking for Brown.  A May 2009 medical record indicates that Brown was depressed about having to stop taking her college courses which she had been very excited about.  (AR 515.)  The record states: "[Brown] has been diagnosed with a learning disability and is having trouble figuring out how to complete the schooling."  (*Id.*)  Over two years later, in the fall of 2011, Brown was taking two community college courses, for a total of about 5.5 hours each week, during a period when she did not work.  (AR 43, 318, 280–83.)  Due to her learning disability, Brown was given "accommodations" to allow her "equal access" to these courses, including 150% time for in-class exams, an opportunity to have exam questions read aloud to her, and the instructor's notes/outline provided before or after each class.  (AR 281–83.)  Glasgo recorded in progress notes that these two courses, with accommodations, were "all [Brown] [could] handle," but they "[gave] her a positive focus."  (AR 318.)  Clearly, Brown was unable to take college-level courses on a full-time basis.  (*See id.*, AR 280.)

A claimant's ability to take two community college courses totaling approximately 5.5 hours each week, with special accommodations, and during a period when the claimant has no job, does not indicate the claimant's ability to work on a full-time basis. As this Court recently stated, "a significant difference exists between [engaging in] sporadic daily activities and working a [40]-hour week."  *Waters v. Astrue*, No. 5:10-CV-110, 2011 WL 1884002, at *7 (D. Vt. May 17, 2011) (citing *Polidoro v. Apfel*, No. 98

CIV.2071(RPP), 1999 WL 203350, at *8 (S.D.N.Y. Apr. 12, 1999) ("A claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job.")). Moreover, the Second Circuit has long held that a claimant need not be an invalid, incapable of performing any daily activities, in order to receive disability benefits. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998); *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988).

In sum, I find that the ALJ did not give good reasons for affording limited weight to the opinions of the treating and examining providers. Most noteworthy, the ALJ's decision to discount these opinions on the grounds that they are inconsistent with the record is not supported by substantial evidence, given that these opinions—which constitute a particularly important part of the record under the regulations—are consistent with each other.

### E.    Agency Consultants Drs. Abramson, Pisanelli, Lester, and Atkins

The ALJ afforded "substantial" or "great" weight to the opinions of non-examining agency consultants Drs. Abramson, Pisanelli, Lester, and Atkins, on the grounds that they are consistent with Brown's demonstrated abilities and the record as a whole. (AR 21, 22.) The ALJ failed to acknowledge two significant facts in his analysis of these opinions. First, as noted above, these consultants never met with, examined, or treated Brown, in contrast with Dr. Huyck, Dr. Park, social worker Perkins, and counselor Glasgo. While the opinions of non-examining consultants can, and often do,

provide valuable support for an ALJ's decision, they should generally be afforded

relatively little weight in the overall disability determination as compared to the opinions

of treating providers and examining consultants. *See Vargas v. Sullivan*, 898 F.2d 293,

295–96 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have

not personally examined the claimant deserve little weight in the overall evaluation of

disability.") (internal quotation marks omitted).

Second, Drs. Abramson and Pisanelli made their opinions about Brown's physical

RFC in August 2010 and January 2011, respectively, before Dr. Huyck examined and

made her opinions about Brown in February 2012 and before Dr. Park made his opinions

in March 2012.  (*See* AR 33–36, 655, 683, 799–806.)  Similarly, Drs. Lester and Atkins

made their opinions about Brown's mental RFC in July 2010 and March 2011,

respectively, before the opinions of Dr. Huyck, Dr. Park, social worker Perkins, and

counselor Glasgo were added to the record.  (*See* AR 33–36, 320, 647, 689, 762–64, 799–

806.)  The opinions of Drs. Lester and Atkins were also made before Brown was

involuntarily admitted for psychiatric treatment at the Brattleboro Retreat due to a suicide

attempt in April 2011.[8]  (*See* AR 707–28.)  One of Brown's treating physicians from that admission stated in a progress note: "Appears to be chronically and fairly severely depressed.  She is intermittently suicidal which may be a facet of a personality disorder but could also represent the degree of her depression."  (AR 709.)  Although the physician noted that Brown's mood seemed to improve considerably when she took her medications, he suspected that her depression was "never in full remission."  (*Id.*)  The agency consultants did not have the opportunity to consider this important medical evidence or the opinions of the relevant treating and examining providers before preparing their reports.  The Second Circuit has held that, where it is unclear whether an agency consultant reviewed "all of [the plaintiff's] relevant medical information," the consultant's opinion is not supported by the evidence of record, as required to override the opinion of a treating physician.  *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011).  Here, it is clear that the agency consultants had not reviewed all of the relevant medical

---

[8]  The ALJ found that Brown's admission to Brattleboro Retreat in April 2011 was a mere "setback" and "not [for] an extended duration," and thus did not constitute an "episode[] of decompensation" for purposes of evaluating the severity of Brown's mental impairments under the "paragraph B" criteria.  (AR 16–17.)  Moreover, the ALJ noted that, by July 2011, Brown "was doing well overall."  (AR 17 citing AR 752, 756).)  One of the progress notes cited by the ALJ in support of this finding, however, indicates otherwise, stating that Brown was "having more suicidal thoughts lately" and "ha[d] a general plan [for suicide]."  (AR 752.)  The ALJ also noted that Brown was "doing better with her depression" in December 2011 (AR 22 (citing AR 792)), but Dr. Huyck's progress note from a little over two months later (February 2012) indicates otherwise:

> [Brown's] [d]epression manifests as not leaving the home, suicidal thoughts, cutting behavior, inattention to self[-]care, poor appetite, feelings of anger, and crying spells. She is on daily medication.  Since being on medication, she has a flare of her depressive and mental health symptoms a few times a month that vary but typically last around a day to a week.  She has sleep disturbance from her back and depression.

(AR 803.)  Although it appears that Brown was no longer suicidal after her April 2011 psychiatric admission, there is no indication that she had significant or lasting improvement with respect to her depression or other mental impairments in that period.

information prior to preparing their reports.  The ALJ at least should have acknowledged this deficiency, noting its effect on the weight afforded to each opinion.

For these reasons, Brown's claim should be remanded to the Commissioner to reweigh the opinions discussed herein in accordance with the applicable law and regulations.  To the extent that the Commissioner finds any of these opinions unclear regarding the extent of Brown's physical or mental limitations, or if the Commissioner finds that the agency consultant opinions might be different in consideration of the treating and examining provider opinions, the applicable sources should be recontacted.

## II.    ALJ's Credibility Determination

The ALJ should also make a new assessment of Brown's credibility on remand.  It is the province of the Commissioner and not the reviewing court to "appraise the credibility of witnesses, including the claimant."  *Aponte v. Sec'y of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984).  Thus, if the Commissioner's credibility findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.  *Id.* (citing *McLaughlin v. Sec'y of Health, Educ., and Welfare*, 612 F.2d 701, 704 (2d Cir. 1982)).  "When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p, 1996 WL 374186, at *4 (July 2, 1996).  These reasons "must be grounded in the evidence and articulated in the determination or decision."  *Id.*

The ALJ found that Brown's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not credible to the extent they [we]re inconsistent

with the [ALJ's RFC] assessment." (AR 19.)  The ALJ based this finding largely on his determination that Brown was able to take two college-level courses, care for her children, and maintain her household.  (AR 19–23.)  These were not sufficient grounds for finding that Brown's allegations of pain, mental impairments, and resulting functional limitations were not credible.  As explained above, the record demonstrates that Brown was unable to care for her children and maintain her household on her own.  (*See* AR 44, 46–47, 230–32, 251, 255, 258–60, 684–88, 765–67, 803.)  Moreover, regarding Brown's ability to take two college-level courses, in determining whether a claimant is disabled, the Commissioner must consider whether the claimant has the ability to work "on a sustained basis." 20 C.F.R. § 404.1512(a).  The ability to perform activities, even work-related activities, sporadically and for short periods of time, is not a basis upon which to deny disability.  *See Balsamo*, 142 F.3d at 81; *Polidoro*, 1999 WL 203350, at *8.

## Conclusion

The ALJ's errors in determining Brown's credibility and assessing the opinions of Dr. Park, Dr. Huyck, social worker Perkins, and vocational counselor Glasgo necessarily affected the ALJ's RFC determination and step-five decision that Brown could perform her past relevant work and other work existing in significant numbers in the national economy.  Thus, these issues should be redetermined on remand.

Brown requests that, instead of remanding for further proceedings, the Court should reverse and remand solely for payment of benefits.  But in cases where there are gaps in the administrative record or, as here, the ALJ has applied an improper legal standard, it is more appropriate to remand for further proceedings and a new decision.

*Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  Thus, Brown's request that the matter be reversed and remanded solely for payment of benefits should be denied.

For these reasons, I recommend that Brown's motion (Doc. 7) be GRANTED, in part, the Commissioner's motion (Doc. 11) be DENIED, and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 18th day of April, 2014.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).